## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JEFFREY ALAN SPINDEL and KEVIN McCARTHY, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br>   v.<br><br>GORTON'S INC.,<br>          Defendant. | Case No. 1:22-cv-10599<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs JEFFREY ALAN SPINDEL and KEVIN McCARTHY, individually and on behalf of other similarly situated individuals, by and through their counsel, hereby file this Class Action Complaint for equitable relief and damages against Defendant GORTON'S INC. ("Gorton's") regarding the false and deceptive marketing and sale of tilapia products labeled with the phrase "sustainably sourced." The products are in fact not sustainably sourced but instead are made from tilapia industrially farmed using unsustainable practices that are environmentally destructive and inhumane. Plaintiffs Spindel and McCarthy allege the following based upon information, belief, and the investigation of their counsel:

<u>**INTRODUCTION**</u>

1.      Gorton's is a wholly owned subsidiary of the Japanese seafood conglomerate Nippon Suisan Kaisha, Ltd., the second-largest seafood company in the world.[1] Gorton's is the largest producer of fish sticks in North America.[2]

---

[1] *Nippon Suisan Kaisha (Nissui)*, World Benchmarking Alliance, https://seafood.worldbenchmarkingalliance.org/companies/nippon-suisan-kaisha-nissui/ (last visited Apr. 20, 2022).
[2] Rachel Sapin, *Nissui-owned Gorton's expanding McDonald's Filet-o-Fish production to West Coast*, IntraFish (Sept. 24, 2021), https://www.intrafish.com/markets/nissui-owned-gortons-expanding-mcdonalds-filet-o-fish-production-to-west-coast/2-1-1071793.

2.      Gorton's products are widely sold throughout the United States.[3]

3.      As part of its seafood offerings, Gorton's sells products, including tilapia products,[4] that are labeled with the claim "sustainably sourced." The tilapia products labeled this way are referred to in this Complaint as the "Products" or "Gorton's Products."[5] An example of Product packaging with a sustainability claim is seen in the image below:



4.      Gorton's claims about sustainability lead consumers to believe that the Products are "sustainably sourced." Consumer research demonstrates that claims like Gorton's suggest to consumers that the tilapia is sustainably sourced in accordance with high environmental and animal welfare standards.

5.      In reality, the Products are made from tilapia who are industrially farmed using unsustainable practices that are environmentally destructive and inhumane.

---

[3] Gorton's, *Find your Favorites*, https://www.gortons.com/where-to-buy (last visited Apr. 20, 2022); Sapin, *supra* note 2.
[4] Gorton's, *See Products*, https://www.gortons.com/product-categories/ (last visited Apr. 20, 2022) (See all "Grilled" products under "Smart Solutions.").
[5] The Products include, but are not limited to, Gorton's "Grilled" and "Natural Catch" tilapia. Discovery may reveal that additional Gorton's representations should be included within the scope of the allegations in this Complaint, and Plaintiffs reserve the right to add such representations. The Products also include any additional Gorton's products that fall within this definition, as revealed through discovery.

6.      Thus, Gorton's marketing—which states that the Products are sustainable—is false and misleading to consumers, who lack the information necessary to determine whether the Products are in fact "sustainably sourced" or to know or ascertain the true nature and sourcing of the Products. Reasonable consumers must rely on Gorton's representations.

7.      Gorton's intended for consumers to rely on its claims about sustainability, and reasonable consumers did and do, in fact, rely on these representations. By deceiving consumers about the nature and sourcing of the Products, Gorton's is able to sell a greater volume of the Products, charge higher prices for the Products, and take away market share from competing products, thereby increasing its own sales and profits.

8.      During any applicable statute of limitations period, Plaintiffs and Class members (described below) saw Gorton's claims about sustainability when purchasing the Products throughout the United States. Based upon these misrepresentations, Plaintiffs and Class members paid the requested price for the Products, purchased the Products when they otherwise would not have, and/or purchased more of the Products than they otherwise would have, had they known the truth about Gorton's production and sourcing practices. As a result, Plaintiffs and all the Class members suffered injury.

9.      Gorton's false and deceptive representations violate the consumer protection statutes of New York, of California, and of the other states in the Multistate Subclass (*see infra*), as well as the common laws of all states where the Products are sold.

10.     Because Gorton's claims about sustainability are false, deceptive, and misleading, Plaintiffs Spindel and McCarthy bring this case on behalf of a class of consumers who purchased the Products nationwide (including a subclass who purchased the Products in New York, a subclass who Purchased the Products in California, and a subclass who purchased the Products in additional

enumerated states) and seeks relief including damages, interest, costs, and reasonable attorneys' fees. Plaintiffs also seek an order declaring that Gorton's deceptive marketing of the Products is unlawful and enjoining such deceptive marketing. Even today, members of the proposed Class are being deceived into purchasing and paying the requested price for the unlawfully marketed Products, and will continue to be deceived unless Gorton's deceptive marketing is enjoined.

## FACT ALLEGATIONS

11.    Gorton's markets the Products throughout the United States.

12.    Gorton's products are widely sold and distributed throughout the United States in both grocery chains and general merchandise retailers, such as WalMart.[6]

13.    On the Products' packaging and labeling, Gorton's markets the Products as "sustainably sourced."

14.    As described below, consumer research shows that marketing like Gorton's leads consumers to believe that the Products are sustainably sourced in accordance with high environmental and animal welfare standards. This is false and misleading.

I.    **Gorton's Marketing Suggests to Consumers That the Products Are Made From Tilapia Sustainably Sourced in Accordance with High Environmental and Animal Welfare Standards.**

15.    The retail packaging of the Products features the claim that the Products are "sustainably sourced." An example of Product packaging at issue in this action is provided above at paragraph 3.

16.    The misrepresentations seen by consumer purchasers appear directly on Product packaging and are necessarily seen by every purchaser.

---

[6] Sapin, *supra* note 2.

17.     Gorton's does not limit its claims about sustainability only to Product packaging; for any consumer who seeks additional information, Gorton's reinforces the on-package claims about sustainability with throughout its website and social media accounts.

18.     For example, Gorton's website states that its "Trusted Catch sustainability and quality initiatives . . . minimize[] their environmental impact"[7] and claims to "utilize[] the latest scientific data and best practices to ensure our seafood is responsibly sourced, made, and packaged for generations to come,"[8] giving an aura of scientific authority to its claims.

19.     On social media, Gorton's has, at various points, reinforced the label representations by claiming that it supplies from "the most sustainable sources,"[9] that it is "SERIOUS ABOUT SUSTAINABILITY,"[10] and that the Products are "RESPONSIBLY SOURCED."[11]

20.     Federal guidance and consumer research show that Gorton's "sustainable" claims suggest to consumers that the Products are made from tilapia sustainably sourced in accordance with high environmental and animal welfare standards.

21.     The Federal Trade Commission ("FTC") has stated that unqualified general environmental benefit claims such as "sustainable" do "imply certain specific environmental benefits."[12] For that reason, the FTC has admonished companies not to use unqualified claims such

---

[7] Gorton's, *We Are Gorton's*, https://www.gortons.com/we-are-gortons/ (last visited Apr. 20, 2022).

[8] Gorton's, *Responsibility*, https://www.gortons.com/sustainability/ (last visited Apr. 20, 2022).

[9]     Gorton's    Seafood    (@gortonsseafood),    Facebook    (Feb.    19,    2018), https://www.facebook.com/gortonsseafood/posts/10156732318518881.

[10] Gorton's, *The Latest and Greatest*, https://www.gortons.com/factoids/serious-sustainability-1/ (last visited Apr. 20, 2022).

[11] Gorton's, *Responsibility*, *supra* note 8.

[12] *FTC Sends Warning Letters to Companies Regarding Diamond Ad Disclosures*, Federal Trade Commission (Apr.   2,   2019),   https://www.ftc.gov/news-events/press-releases/2019/03/ftc-sends-warning-letters-companies-regarding-diamond-ad; *see also* FTC Green Guides, 16 C.F.R. § 260.4(b) (2012).

as "sustainable," because "it is highly unlikely that they can substantiate all reasonable interpretations of these claims."[13]

22.     Research demonstrates that claims related to sustainability are perceived by many consumers to mean "produced according to higher animal welfare standards."[14]

23.     Consumers have ranked the "minimal use of hormones and drugs," "no pollution to the environment," and "respect of fish welfare" as three of the four most important elements of sustainable aquaculture.[15]

24.     A study on consumer perception of the phrase "ecologically sustainable" found that a majority of consumers "expect eco-labelled seafood to be harvested in a way that reduced impact on the fish population or the marine environment."[16] The same study showed that consumers trust such claims; only 4% of respondents "expressed skepticism about the term ['ecologically sustainable']" and felt that "it was primarily a marketing term without real meaning."[17]

## II.    Contrary to Gorton's Claims About Sustainability, the Products Are Sourced From Tilapia Industrially Farmed Using Unsustainable Practices That Are Environmentally Destructive and Inhumane.

25.     Gorton's "sustainable" claims suggest to consumers that the Products are sustainably sourced in accordance with high environmental and animal welfare standards, but in reality, the Products are sourced from tilapia industrially farmed using unsustainable practices that are environmentally destructive and inhumane.

---

[13] *FTC Sends Warning Letters to Companies Regarding Diamond Ad Disclosures*, *supra* note 12.
[14] Katrin Zander et al., *Consumers' Willingness to Pay for Sustainable Seafood Made in Europe*, 30 J. Int'l Food & Agribusiness Mktg. 251 (Dec. 22, 2017).
[15] *Id*.
[16] Loren McClenachan et al., *Fair Trade Fish: Consumer Support for Broader Seafood Sustainability*, 17 Fish & Fisheries 825 (Sept. 2016).
[17] *Id*.

26.     Upon information and belief, the Products are made from tilapia sourced, at least in part, from China.[18] Tilapia are not native to China—instead, these tilapia are raised in, and sourced from, large industrial fish farms known for their unsustainable production methods.[19]

27.     The Monterey Bay Aquarium Seafood Watch ("Seafood Watch") specifically warns consumers to ***avoid*** tilapia farmed in China due to sustainability concerns.[20]

28.     These concerns arise in part because of the manner in which tilapia (such as, on information and belief, those used for the Products) are raised and sourced in China, as set forth below.

A.     **Environmental Harm**

29.     Tilapia farms in China use primarily an ecologically dangerous method of tilapia production known as pond aquaculture, in which thousands of fish are crowded into shallow ponds. Examples of this type of farming are seen in the images below:



---

[18] Gorton's, *Frequently Asked Questions*, https://www.gortons.com/frequently-asked-questions (last visited Apr. 20, 2022); Phone call to 1-800-222-6846, Gorton's Customer Service (Nov. 10, 2021) ("Our tilapia comes from certified sustainable sources in Southeast Asia and Central America.").

[19] Tamar Haspel, *Tilapia has a terrible reputation. Does it deserve it?*, Wash. Post (Oct. 24, 2016), https://www.washingtonpost.com/lifestyle/food/tilapia-has-a-terrible-reputation-does-it-deserve-it/2016/10/24/4537dc96-96e6-11e6-bc79-af1cd3d2984b_story.html.

[20] *Id.*

30.    Pond aquaculture is a particularly risky form of fish farming because, among other problems, this method is typically done in regions where tilapia ponds are "vulnerable to river flooding events."[21]

31.    Because pond cultivation occurs in flood-vulnerable regions, experts have concluded that diseases and escaped tilapia have spread from the ponds into the environment during flooding events, leading to "documented examples of tilapia populations vastly outcompeting local fish species for resources in Chinese waterways.[22] For this reason, Tilapia are "highly invasive."[23]

32.    To enable the tilapia to survive in these stressful, crowded, and unsanitary conditions, they are routinely treated with antibiotics and biocides. In addition, it is common practice to treat the food given to tiliapia with ethoxyquin, discussed *infra*. Data on the amount of antibiotics and dangerous chemicals used in producing tilapia farmed in China remain uncertain due to poor reporting and underenforcement; Seafood Watch explains: "Evidence demonstrates the use of a wide variety of chemicals in Asian aquaculture [and] . . . several recent publications outline China's recognition of the overuse of antimicrobials."[24]

33.    There is now evidence of antibiotic resistance throughout the tilapia cultivation industry.[25]

34.    From 2007 to 2018, the FDA rejected more than 200 tilapia shipments from China,[26] citing the presence of harmful chemicals, and toxins, as well as antibiotics considered

---

[21] Seafood Watch Consulting Researchers, *Tilapia—China*, Monterey Bay Aquarium Seafood Watch (Nov. 14, 2018).
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.*

"Highly Important for Human Medicine" by the World Health Organization.[27]

35.     Evidence indicates that tilapia farms in China still use the dangerous chemical "malachite green."[28]

36.     Malachite green is a dye that is  often used "indiscriminately" in intensive fish farming as an antimicrobial and antiparasitic.[29]

37.     Malachite green was banned for use in aquaculture by the Food and Drug Administration in 1983 due to its toxicity and carcinogenic effects.[30]

38.     Independent laboratory testing of Gorton's Products has revealed the presence of at least one toxin, ethoxyquin, which is routinely used as a preservative in industrial fish feed.

39.     Ethoxyquin has been banned from use in animal feed in the European Union because "it has not been established that the additive does not have an adverse effect on animal health, human health or the environment."[31]

40.     Research has specifically shown that the use of ethoxyquin as a feed additive "poses a risk for aquatic life."[32]

---

[27] *Id.*

[28] *Id.*

[29] Juliana Campos Hashimoto et. al,  *Considerations on the Use of Malachite Green in Aquaculture and Analytical Aspects of Determining the Residues in Fish*, 20 J. Aquatic Food Prod. Tech. 273 (2011).

[30] PubChem, *Compound summary: Malachite Green*, https://pubchem.ncbi.nlm.nih.gov/compound/Malachite-green (last visited Apr. 20, 2022).

[31] Eur. Comm'n Implementing EU Reg. 2017/ 962 *Suspending the Authorisation of Ethoxyquin as a Feed Additive for All Animal Species and Categories*, 2017 O.J. (L 145) 13, https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32017R0962&from=EN. In particular, the European Food Safety Authority expressed concern regarding the lack of data with respect to the genotoxicity of one of the metabolites of ethoxyquin and the potential mutagenicity of *p*-phenetidine, which ethoxyquin is made from and which is present as an impurity in commercially available ethoxyquin used as a preservative.

[32] Sophia Egloff & Constanze Pietsch, *Ethoxyquin: a feed additive poses a risk for aquatic life*, 131 Diseases of Aquatic Organisms 39 (Oct. 16, 2018), https://doi.org/10.3354/dao03279.

41.     Further, environmental standards are underenforced on tilapia farmers in China, and in many cases, exist only to "facilitate the economic growth of aquaculture and not limit the environmental impact."[33]

**B.      Poor Animal Welfare**

42.     In addition to their negative impacts on the surrounding environment, the conditions under which tilapia (such as, on information and belief, those used in Gorton's Products) are raised in pond aquaculture inflict unnecessary suffering on the fish, contrary to what consumers believe the Gorton's claims about sustainability to mean.

43.     The extremely crowded and unsanitary environments of ponds are nothing like the natural environment in which the tilapia would live in the wild.

44.     In such crowded and unsanitary conditions, tilapia become highly aggressive and cause harm to each other.[34] Bullied fish in pond systems are often unable to access equal feed opportunities, territory options, or breeding choices.[35]

45.     The ponds are also devoid of the environmental variety and enrichment tilapia would experience in the wild; for example, although tilapia are a nesting species, they "are generally unable to form nests when raised in barren aquaculture tanks or ponds."[36]

46.     In barren pond environments, tilapia experience "frustration, boredom, and discomfort" that result in "abnormal or sterotypic behaviors."[37]

47.     Moreover, tilapia in pond systems are particularly vulnerable to predation, due to the large number of fish housed in one place, which can lead to fear, injury, trauma, and death.

---

[33] Seafood Watch Consulting Researchers, *supra* note 21.
[34] Marco Cerqueira & Thomas Billington, *Fish welfare improvements in aquaculture*, Fish Welfare Initiative (Nov. 1, 2020), https://files.fwi.fish/Fish_Welfare_Improvements_in_Aquaculture.pdf.
[35] *Id.*
[36] *Id.*; *see also* Eliane Gonclaves-de-Freitas, *Social behavior and welfare in Nile Tilapia*, 4 Fishes 23 (2019).
[37] Cerqueira & Billington, *supra* note 34.

Even the presence of predators attracted to the ponds can "manifest in behavioral changes and a reduction in feeding."[38]

48.     Thus, Gorton's marketing of the Products—which suggests to consumers that the Products are made from tilapia sustainably sourced in accordance with high environmental and animal welfare standards—is false and misleading.

### III.   Gorton's Representations About Sustainability Are Material to Consumers.

49.     The FTC has acknowledged that "sustainable" claims are material to consumers.[39]

50.     Researchers have found that consumers seek out and are willing to pay significantly more for products labeled as "ecologically sustainable."[40]

51.     This finding is consistent with research that has found that "consumers are willing to pay to improve animal welfare and reduce undesirable environmental effects from fish farming."[41]

52.     On information and belief, Gorton's markets this Products with claims about sustainability in order to sell more Products at the requested price, because Gorton's knows that consumers will believe and rely on the claims.

### IV.   Gorton's Claims About Sustainability Mislead and Harm Consumers.

53.     Gorton's claims about sustainability deceive and/or are likely to deceive consumers. Reasonable consumers have been, and continue to be, deceived into believing that the Products are made from tilapia sustainably sourced in accordance with high environmental and

---

[38] *Id.*
[39] *See FTC Sends Warning Letters to Companies Regarding Diamond Ad Disclosures*, *supra* note 12.
[40] McClenachan et al., *supra* note 16.
[41] Ingrid Olesen et al., *Eliciting Consumers' Willingness to Pay for Organic and Welfare-Labelled Salmon in a Non-Hypothetical Choice Experiment*, 127 Livestock Sci. 218 (Feb. 2010), https://pubag.nal.usda.gov/catalog/775401.

11

animal welfare standards, when in reality, and on information and belief, the Products are made using unsustainable practices that are environmentally destructive and inhumane.

54.     Consumers cannot discover the true nature and sourcing of the Products from the Products' packaging. Ordinary consumers do not have sufficient knowledge about the tilapia industry to know or to ascertain that the Products are made from tilapia raised with unsustainable practices.

55.     Plaintiffs' counsel were able to discover information about the true nature and sourcing of the Products only by investigating Gorton's supply chain and by conducting independent laboratory testing, which revealed the presence of ethoxyquin in a sample of the Product.

56.     Gorton's knows that the Products are marketed as "sustainably sourced." Gorton's also knows how the Products are sourced and produced. Gorton's thus knows, and/or knew or should have known, the facts demonstrating that the Products were and are falsely and deceptively labeled and marketed.

57.     The production process for the tilapia used in the Products is known to Gorton's and its suppliers and has not been disclosed to Plaintiffs or to the Class of consumers whom Plaintiffs seek to represent.

58.     Gorton's concealment tolls any applicable statute of limitations.

59.     To this day, Gorton's continues to conceal the true nature and sourcing of the Products.

60.     In making the false, deceptive, and misleading representations at issue, Gorton's also knows and intends that consumers will buy more of and/or pay more for fish products

marketed as "sustainably sourced," furthering Gorton's interest of increasing its sales and decreasing sales of competitors whose products are truthfully marketed.

61.     Had Gorton's not made the false, deceptive, and misleading representations, Plaintiffs and the Class would not have been willing to pay the same price for the Products, would have chosen competing products, and/or would not have purchased as much of the Products.

62.     Gorton's ongoing false, deceptive, and misleading labeling and marketing of the Products continues to harm the consumers whom Plaintiffs seek to represent, and will continue to harm consumers if Gorton's conduct is not enjoined.

63.     Consumers are at risk of real, immediate, and continuing harm if Gorton's continues to sell the Products using the false and deceptive claims about sustainability.

## JURISDICTION AND VENUE

64.     This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act.

65.     Plaintiff Jeffrey Alan Spindel is a citizen of New York. Plaintiff Kevin McCarthy is a citizen of California. There are at least 100 members in the proposed plaintiff class, including citizens of all 50 states and the District of Columbia.

66.     On information and belief, Defendant Gorton's is a citizen of the Commonwealth of Massachusetts.

67.     The amount in controversy exceeds $5,000,000, exclusive of interest and costs.

68.     This Court has personal jurisdiction over Defendant Gorton's. Gorton's is a Massachusetts corporation headquartered in Gloucester, Massachusetts. Gorton's purposefully avails itself of the laws of Massachusetts; markets its Products to consumers in Massachusetts, and

throughtout the United States; and distributes its Products to its retailers in Massachusetts, and throughout the United States.

69.     Venue is proper in this District under 28 U.S.C. § 1391(a)-(b). Substantial acts in furtherance of the alleged improper conduct, including the creation and/or authorization of false and deceptive labeling and marketing of the Products, as well as the dissemination of deceptive labeling and sales of the Products at issue, occurred within this District. Gorton's is a citizen of Massachusetts with a principal place of business in Massachusetts.

## PARTIES

70.     Defendant Gorton's is a Massachusetts corporation headquartered in Gloucester, Massachusetts. Defendant Gorton's is a wholly owned subsidiary of Nippon Suisan Kaisha, Ltd.

71.     Defendant Gorton's produces, processes, markets, and distributes the tilapia Products at issue.

72.     Defendant Gorton's markets and distributes the Products through a variety of national grocery chains and general merchandise retailers, regional stores, and other retail outlets throughout the United States.

73.     Plaintiff Jeffrey Alan Spindel is a citizen of New York and a resident of Haverstraw, New York. At all times mentioned herein, Plaintiff Spindel was and is an individual consumer older than age 18.

74.     Plaintiff Kevin McCarthy is a citizen of California and a resident of San Francisco, California. At all times mentioned herein, Plaintiff McCarthy was and is an individual consumer older than age 18.

75.     From 2018 through 2020, which is within the Class Period (as defined below), Plaintiff Spindel purchased Gorton's tilapia Products with the claims about sustainability. Plaintiff

Spindel purchased these Products approximately monthly from ShopRite stores located at 243 East Route 59 in West Nyack, New York, and 56 West Ramapo Road in Garnerville, New York.

76.     In making his purchases, Plaintiff Spindel saw, reasonably believed, and relied upon Gorton's "sustainably sourced" claim on the Product packaging. An example of the type of Product packaging that Plaintiff Spindel saw and relied upon is depicted *supra*, at paragraph 3.

77.     Plaintiff Spindel was willing to pay the requested price for Gorton's Products because he reasonably expected that the tilapia used in the Products were sustainably sourced in accordance with high environmental and animal welfare standards.

78.     Had Plaintiff Spindel known that the Products were made from tilapia industrially farmed using unsustainable practices that are environmentally destructive and inhumane, he would not have purchased or continued to purchase the Products at the requested price.

79.     Plaintiff Spindel continues to purchase fish products, including tilapia products, and intends to continue purchasing tilapia products in the future, but he does not currently purchase Gorton's Products.

80.     Plaintiff Spindel wishes to be able to continue purchasing Gorton's Products, and wishes to see the Products truthfully made with tilapia sustainably sourced in accordance with high environmental and animal welfare standards, and intends to purchase such Products if Gorton's marketing is made truthful. Moreover, Plaintiff Spindel is aware that proposed Class members are currently purchasing, and will continue to purchase, the Products, unaware that Gorton's representations are false and deceptive, unless Gorton's conduct is enjoined.

81.     From 2018 through 2020, which is within the Class Period (as defined below), Plaintiff McCarthy purchased Gorton's tilapia Products with the claims about sustainability.

Plaintiff McCarthy purchased these Products approximately twice per month from a Safeway store located at 2020 Market Street in San Francisco, California.

82.     In making his purchases, Plaintiff McCarthy saw, reasonably believed, and relied upon Gorton's "sustainably sourced" claim on the Product packaging. An example of the type of Product packaging that Plaintiff McCarthy saw and relied upon is depicted *supra*, at paragraph 3.

83.     Plaintiff McCarthy was willing to pay the requested price for Gorton's Products because he reasonably expected that the tilapia used in the Products were sustainably sourced in accordance with high environmental and animal welfare standards.

84.     Had Plaintiff McCarthy known that the Products were made from tilapia industrially farmed using unsustainable practices that are environmentally destructive and inhumane, he would not have purchased or continued to purchase the Products at the requested price.

85.     Plaintiff McCarthy continues to purchase fish products, including tilapia products, and intends to continue purchasing tilapia products in the future, but he does not currently purchase Gorton's Products.

86.     Plaintiff McCarthy wishes to be able to continue purchasing Gorton's Products, and wishes to see the Products truthfully made with tilapia sustainably sourced in accordance with high environmental and animal welfare standards, and intends to purchase such Products if Gorton's marketing is made truthful. Moreover, Plaintiff McCarthy is aware that proposed Class members are currently purchasing, and will continue to purchase, the Products, unaware that Gorton's representations are false and deceptive, unless Gorton's conduct is enjoined.

## CLASS ALLEGATIONS

87.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

88.     This action is maintainable as a class action under Rules 23(b)(2) and (3) of the Federal Rules of Civil Procedure.

89.     The class definition(s) may depend on the information obtained throughout discovery. At this time, Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and all other similarly situated individuals within the United States (the "Class"), defined as follows: All consumers who purchased Gorton's Products (as defined herein) in the United States within the applicable statute of limitations and until the date of class certification (the "Class Period").

90.     Included in the Class is a subclass of all persons who purchased the Products (as defined herein) within the State of New York during the Class Period (the "New York Subclass").

91.     Included in the Class is a subclass of all persons who purchased the Products (as defined herein) within the State of California during the Class Period (the "California Subclass").

92.     Included in the Class is a subclass of all persons (the "Multistate Subclass") who purchased the Products (as defined herein) within the following jurisdictions during the Class Period: Alabama, Arizona, California, Connecticut, Delaware, District of Columbia, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Dakota, Texas, Vermont, Virginia, West Virginia, and Wisconsin.

93.     Excluded from the Class are (1) Gorton's, any entity or division in which Gorton's has a controlling interest, and Gorton's legal representatives, officers, directors, assigns, and successors; and (2) the judge to whom this case is assigned and the judge's staff.

94.     Plaintiffs bring the class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3).

95.     Plaintiffs reserve the right to amend the Class and/or Subclass definitions if further information and discovery indicate that the Class and/or Subclass definitions should be narrowed, expanded, or otherwise modified.

96.     All members of the Class, the New York Subclass, the California Subclass, and the Multistate Subclass were, and are, similarly affected by the false, deceptive, and misleading labeling and marketing of Gorton's Products, and the relief sought herein is for the benefit of Plaintiffs and members of the Class, the New York Subclass, the California Subclass, and the Multistate Subclass.

**I.      Numerosity**

97.     At this time, Plaintiffs do not know the exact number of Class members. Based on the wide distribution of Gorton's Products, Plaintiffs believe that the Class comprises thousands of consumers. The number of consumers in the Class, and in each proposed Subclass, is so large as to make joinder impracticable, if not impossible. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, email, Internet postings, and/or published notice.

## II.     Commonality

98.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)     Whether Gorton's is responsible for the labeling, marketing, and advertising at issue;

(b)     Whether the labeling, marketing, and advertising of the Products was false, deceptive, misleading, unfair, fraudulent, and/or unlawful;

(c)     Whether Gorton's breached a warranty created through the labeling, marketing, and advertising of the Products; and

(d)     Whether Gorton's conduct, as set forth above, injured and may continue to injure Class members.

## III.     Typicality

99.     Plaintiffs' claims are typical of those of the Class, as the claims arise from the same course of conduct by Gorton's, and the relief sought is common to the Class members.

100.     Plaintiffs, like all Class members, relied on Gorton's false and deceptive representations and purchased the Products, purchased more of the Products, and/or paid the requested price for the Products when they otherwise would not have if the Products had been truthfully marketed and advertised, thereby sustaining injury from Gorton's wrongful conduct.

101.     There are no defenses available to Gorton's that are unique to either Plaintiff Spindel or Plaintiff McCarthy.

## IV.     Adequacy

102.     Plaintiffs will fairly and adequately protect the interests of the Class members.

103.     Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the Class members they seek to represent, and Plaintiffs have retained counsel competent and experienced in both consumer protection and class action litigation.

19

104.    Undersigned counsel have represented consumers in a variety of actions seeking to protect consumers from false, deceptive, and misleading business practices.

## V.    Predominance and Superiority of Class Action

105.    The prerequisites to maintain a class action pursuant to Federal Rule of Civil Procedure 23(b)(3) are met because questions of law and fact common to each Class member predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

106.    Individual joinder of the Class members is not practicable, and questions of law and fact common to the Class predominate over any questions affecting only individual Class members. Each Class member has been damaged and is entitled to recovery as a result of the violations alleged herein.

107.    Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual Class members to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Class action treatment will allow those persons similarly situated to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

108.    Plaintiffs are unaware of any difficulties in managing this case that would preclude proceeding as a class action.

## VI.    Declaratory and Injunctive Relief

109.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Gorton's acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate the injunctive relief sought on behalf of the Class.

110.    Given the large number of consumers of the Products, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications.

## CAUSES OF ACTION

### Count I

**Violations of New York General Business Law § 349
(on Behalf of Plaintiff Spindel and the New York Subclass)**

111.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

112.    New York General Business Law ("NYGBL") § 349(a) provides: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

113.    As set forth above, Gorton's claims about sustainabilty—which suggest to consumers that the Products are sustainably sourced in accordance with high environmental and animal welfare standards—are materially false, deceptive, and misleading. The Products marketed with the phrase "sustainably sourced" are instead made from tilapia industrially farmed using unsustainable practices that are environmentally destructive and inhumane.

114.    Gorton's made the false, deceptive, and misleading representations willfully, wantonly, and/or with reckless disregard for the truth.

115.    Plaintiff Spindel and the New York Subclass are consumers who purchased the Products in New York.

116.    Gorton's representations induced Plaintiff Spindel and the New York Subclass to purchase, purchase more of, and/or pay the requested price for the Products when they otherwise would not have. As a result, Plaintiff Spindel and the New York Subclass have been injured by

their purchase of the Products, which were worth less than what they bargained for and/or paid, and which they selected over other products that may have been truthfully marketed.

117.     Plaintiff Spindel and the other members of the New York Subclass paid more for the Products marketed with claims about sustainability than they would have paid for the same Products marketed without claims about sustainability. Making the misleading claims about sustainability enables Gorton's to charge more for the Products than they could without such claims about sustainability.

118.     Thus, Gorton's has violated, and continues to violate, NYGBL § 349. As a direct and proximate result of Gorton's violation of § 349, Plaintiff Spindel and the New York Subclass have suffered damages in an amount to be determined at trial.

119.     For the foregoing reasons, Gorton's is liable to Plaintiff Spindel and the New York Subclass for actual damages or $50 for each sale of a Product (whichever is greater, pursuant to NYGBL § 349(h)), attorneys' fees, and the costs of this suit. The Court may, in its discretion, award damages to an amount up to three times the actual damages, based on Gorton's willful and knowing violation of NYGBL § 349.

120.     In addition, Gorton's continues to engage in the deceptive conduct and, upon information and belief, will keep doing so unless enjoined by this Court. Members of the New York Subclass that Plaintiff Spindel seeks to represent are purchasing, and will continue to purchase, the deceptively marketed Products. Further, Plaintiff Spindel continues to be harmed because he can no longer trust the veracity of the Product labels or Gorton's claims about sustainability. Thus, the false, deceptive, and misleading practices of Gorton's, as described above, present an ongoing threat to Plaintiff Spindel and the New York Subclass.

121.   Plaintiff Spindel and the New York Subclass seek preliminary and permanent injunctive relief against Gorton's deceptive marketing of the Products.

122.   Pursuant to NYGBL § 349(h), Plaintiff Spindel seeks an order of this Court that includes, but is not limited to, an order enjoining Gorton's from continuing to engage in the deceptive marketing of the Products as alleged herein.

123.   Plaintiff Spindel and the New York Subclass may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

<b><u>Count II</u></b>

<b>Violations of New York General Business Law § 350<br>(on Behalf of Plaintiff Spindel and the New York Subclass)</b>

124.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

125.   NYGBL § 350 provides: "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful." Section 350-a defines "false advertising," in relevant part, as "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect."

126.   As set forth above, Gorton's representations about sustainability are materially false, deceptive, and misleading, and thus constitute false advertising within the meaning of § 350.

127.   Gorton's made the false, deceptive, and misleading representations willfully, wantonly, and/or with reckless disregard for the truth.

128.   Plaintiff Spindel and the New York Subclass are consumers who purchased the Products in New York.

129.   Gorton's Sustainable Representations induced Plaintiff Spindel and the New York Subclass to purchase, purchase more of, and/or pay a higher price for the Products when they

23

otherwise would not have. As a result, Plaintiff Spindel and the New York Subclass have been injured by their purchase of the Products, which were worth less than what they bargained for and/or paid, and which they selected over other products that may have been truthfully marketed.

130.    Thus, Gorton's has violated, and continues to violate, NYGBL § 350. As a direct and proximate result of Gorton's violation of § 350, Plaintiff Spindel and the New York Subclass have suffered damages in an amount to be determined at trial.

131.    For the foregoing reasons, Gorton's is liable to Plaintiff Spindel and the New York Subclass for actual damages or $500 for each sale of a Product (whichever is greater, pursuant to NYGBL § 350-e(3)), attorneys' fees, and the costs of this suit. The Court may, in its discretion, award damages to an amount up to three times the actual damages, based on Gorton's willful and knowing violation of § 350.

132.    In addition, Gorton's continues to engage in the deceptive conduct and, upon information and belief, will keep doing so unless enjoined by this Court. Members of the New York Subclass that Plaintiff Spindel seeks to represent are purchasing, and will continue to purchase, the deceptively marketed Products. Thus, Gorton's false advertising, as described above, presents an ongoing and serious threat to Plaintiff Spindel and the New York Subclass.

133.    Plaintiff Spindel and the New York Subclass seek preliminary and permanent injunctive relief against Gorton's false advertising of the Products.

134.    Pursuant to NYGBL § 350-e(3), Plaintiff Spindel seeks an order of this Court that includes, but is not limited to, an order enjoining Gorton's from continuing to engage in false advertising of the Products as alleged herein.

135.    Plaintiff Spindel and the New York Subclass may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

## COUNT III
### Unfair and Deceptive Acts and Practices
### in Violation of the California Consumer Legal Remedies Act
### (on Behalf of Plaintiff McCarthy and the California Subclass)

136.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

137.     This cause of action is brought pursuant to California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750-1785 (the "CLRA").

138.     Plaintiff McCarthy and other members of the California Subclass are "consumers," as the term is defined by California Civil Code § 1761(d), because they bought Gorton's Products for personal, family, or household purposes.

139.     Plaintiff McCarthy, the other members of the California Subclass, and Gorton's have engaged in "transactions," as that term is defined by California Civil Code §1761(e).

140.     The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purpose of the CLRA, and the conduct was undertaken by Gorton's in transactions intended to result in, and which did result in, the sale of goods to consumers.

141.     As alleged more fully above, Gorton's has violated the CLRA by falsely representing to Plaintiff McCarthy and the other members of the California Subclass that the Products are made with sustainably sourced tilapia.

142.     As a result of engaging in such conduct, Gorton's has violated California Civil Code § 1770(a)(5), (a)(7), and (a)(9).

143.     Gorton's acted with oppression, fraud, or malice when falsely representing that the Products are made with sustainably sourced tilapia.

144.    CLRA § 1782 NOTICE. On March 14, 2022, a CLRA demand letter was sent on behalf of Plaintiff McCarthy to Gorton's, which provided notice of the violation of the CLRA by Gorton's and demanded that within thirty (30) days from that date, Gorton's correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and/or deceptive practices complained of herein. The letter also stated that if Gorton's refused to do so, a complaint seeking damages in accordance with the CLRA would be filed. Gorton's received the letter on behalf of Plaintiff McCarthy but has failed to comply with the letters. Accordingly, pursuant to California Civil Code § 1780(a)(3), Plaintiff McCarthy, on behalf of himself and the California Subclass, seeks compensatory damages, punitive damages, injunctive relief, and restitution of any ill-gotten gains due to Gorton's acts and practices.

## COUNT IV
**Violations of California's False Advertising Law
(on Behalf of Plaintiff McCarthy and the California Subclass)**

145.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

146.    As alleged more fully above, Gorton's has falsely advertised the Products with claims about sustainability.

147.    At all material times, Gorton's engaged in a scheme of offering the Products for sale to Plaintiff McCarthy and the other members of the California Subclass through, *inter alia*, grocery chains and general merchandise retailers.

148.    The misrepresentations and non-disclosures by Gorton's of material facts, as detailed above, constitute false and misleading advertising, and therefore constitute a violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 *et seq*.

26

149.    Said advertisements and inducements were made within the State of California and come within the definition of advertising contained in the FAL, in that such promotional materials were intended as inducements to purchase the Gorton's Products and are statements disseminated by Gorton's to, and intended to reach, Plaintiff McCarthy and the other members of the California Subclass. Gorton's knows, or in the exercise of reasonable care should know, that these representations are misleading and deceptive.

150.    Gorton's acted with oppression, fraud, or malice when making misrepresentations and failing to disclose material facts with respect its advertising of the Products.

151.    The above-described acts of Gorton's did deceive, were likely to deceive, and are likely to continue deceiving reasonable consumers, including Plaintiff McCarthy and the other members of the California Subclass, by obfuscating the nature and sourcing of the Products, in violation of the FAL.

152.    Plaintiff McCarthy and the other members of the California Subclass have suffered injury in fact and have lost money or property as a result of the violations by Gorton's of the FAL.

153.    Pursuant to California Business and Professions Code § 17535, Plaintiff McCarthy and the California Subclass seek an order of this Court that includes, but is not limited to, requiring Gorton's to:

(a)    provide restitution to Plaintiff McCarthy and the other members of the California Subclass;

(b)    cease its unlawful and deceptive acts; and

(c)    pay the attorney fees and costs of Plaintiff McCarthy and the Californnia Subclass.

## COUNT V

**Violation of California's Unfair Competition Law
(on Behalf of Plaintiff McCarthy and the California Subclass)**

154.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

155.    By committing the acts and practices alleged herein, Gorton's has violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, as to the California Subclass as a whole, by engaging in unlawful, fraudulent, and unfair conduct.

156.    Gorton's has violated the UCL's proscription against engaging in ***unlawful*** conduct as a result of:

(a)    Violations of the CLRA, Cal. Civ. Code §§ 1770(a)(5), (a)(7), and (a)(9), as alleged above; and

(b)    Violations of the FAL, Cal. Bus. & Prof. Code § 17500 *et seq.*, as alleged above.

157.    The acts and practices of Gorton's, as described above, also violate the UCL's proscription against engaging in ***fraudulent*** conduct.

158.    As more fully described above, the misleading marketing and advertising of the Gorton's Products is likely to deceive reasonable consumers. Indeed, Plaintiff McCarthy and the other members of the California Subclass were deceived regarding the "sustainable" qualities of the Products, as the marketing and advertising of the Products by Gorton's misrepresent or omit the true facts concerning the benefits of the Products. Those acts are fraudulent business practices.

159.    The acts and practices of Gorton's, as described above, also violate the UCL's proscription against engaging in ***unfair*** conduct.

160.    Plaintiff McCarthy and the other members of the California Subclass suffered injury by virtue of buying Gorton's Products that they would not have purchased, or would not

28

have paid the requested prices for, or would have purchased fewer of, absent the unlawful, fraudulent, and unfair marketing and advertising by Gorton's.

161.    There is no benefit to consumers or competition from deceptively marketing products like the Gorton's Products, which purport to be sustainably sourced when these unqualified claims are false.

162.    Plaintiff McCarthy and the other members of the California Subclass had no way of reasonably knowing that the Gorton's Products they purchased were not as marketed or advertised. Thus, they could not have reasonably avoided the injury each of them suffered.

163.    The consequences of the conduct by Gorton's, as described above, outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives that exist in the marketplace, and such conduct is immoral, unethical, and unscrupulous; offends established public policy; and/or is substantially injurious to Plaintiff McCarthy and the other members of the California Subclass.

164.    Gorton's acted with oppression, fraud, or malice when engaging in unlawful, fraudulent, and unfair conduct, as more fully described above.

165.    Pursuant to California Business and Professional Code § 17203, Plaintiff McCarthy and the members of the California Subclass seek an order of this Court that, *inter alia*, requires Gorton's to:

(a)    provide restitution to Plaintiff McCarthy and the other members of the California Subclass;

(b)    disgorge all revenues obtained as a result of violations of the UCL;

(c)    cease its unlawful and deceptive acts; and

(d)    pay the attorneys' fees and costs of Plaintiff McCarthy and the California Subclass.

**Count VI**

**Deceptive Acts or Practices in Violation of State Consumer Protection Statutes
(on Behalf of Plaintiffs and the Multistate Subclass)**

166.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

167.    As set forth above, Gorton's claims about sustainability are materially false, deceptive, and misleading.

168.    The consumer protection statutes of the states in the Multistate Subclass broadly prohibit deceptive acts or practices in the conduct of trade or commerce.

169.    Gorton's false, deceptive, misleading, and fraudulent practices in labeling, advertising, and marketing the Products, as set forth in this Complaint, violate each of the following consumer protection statutes to the extent that the Products have been marketed, and purchased by Multistate Subclass members, in each respective jurisdiction: Ala. Code § 8-19-5(27); Ariz. Rev. Stat. § 44-1522; Cal. Bus. & Prof. Code § 17200; Cal. Bus. & Prof. Code § 17500; Cal. Civ. Code § 1770(a); Conn. Gen. Stat. § 42-110b(a); Del. Code Ann. tit. 6 § 2513(a); D.C. Code § 28-3904; Fla. Stat. Ann. § 501.204; Ga. Code § 10-1-393(a); 815 Ill. Comp. Stat. Ann. § 505/2; Ind. Code § 24-5-0.5-3(a); Iowa Code § 714H.3(1); Kan. Stat. § 50-626(a); Ky. Rev. Stat. § 367.170; Md. Comm. Law Code Ann. § 13-303(1); Mass. Gen. Laws Ch. 93A § 2(a); Mich. Comp. Laws Ann. § 445.903(1); Minn. Stat. § 325F.69(1); Mo. Rev. Stat. § 407.020(1); Neb. Rev. Stat. § 59-1602; N.H. Rev. Stat. § 358-A:2; N.J. Stat. Ann. § 56:8-2; N.Y. Gen. Bus. Law §§ 349(a), 350; N.C. Gen. Stat. § 75-1.1(a); N.D. Century Code §§ 51-15-02, 51-15-02.3; Ohio Rev. Code § 1345.02(a); Okla. Stat. Ann. tit. 15 § 753; 73 Pa. Stat. § 201-3(a); R.I. Gen. Laws § 6-13.1-2; S.D. Codified Laws § 37-24-6(1); Tex. Bus. & Com. Code §§ 17.46(a); Vt. Stat. Ann. tit.

9 § 2453(a); Va. Code Ann. § 59.1-200(A); W. Va. Code § 46A-6-104; and Wis. Stat. Ann. § 100.18(1).

170.    Gorton's violated these statutes by falsely and deceptively labeling and advertising the Products as "sustainably sourced" when the Products are made from tilapia industrially farmed using unsustainable practices that are environmentally destructive and inhumane.

171.    Gorton's representations were material to Plaintiffs and the Multistate Subclass members' decisions to purchase the Products, to purchase as much of them as they did, and to pay the requested price.

172.    Plaintiffs and the Multistate Subclass members relied upon Gorton's representations in purchasing the Products.

173.    Gorton's intended for Plaintiffs and the Multistate Subclass members to rely upon its deceptive labeling and advertising, and reasonable consumers have relied upon Gorton's deceptive labeling and advertising.

174.    Gorton's acted willfully, wantonly, with reckless disregard for the truth, and/or negligently.

175.    Gorton's acted with oppression, fraud, or malice when engaging in false, deceptive, misleading, and fraudulent practices in labeling, advertising, and marketing the Products.

176.    Plaintiffs and all Multistate Subclass members have been injured in that they purchased the Products, paid the requested price, and received less than what they bargained and/or paid for.

177.    Plaintiffs and the Multistate Subclass members are entitled to recover compensatory damages, restitution, punitive and special damages, treble damages, attorneys' fees and costs, and other appropriate relief, including injunctive and declaratory relief.

**Count VII**

**Breach of Express Warranty
(on Behalf of Plaintiffs and the Class)**

178.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

179.    Gorton's provided Plaintiffs and Class members with a written, express warranty that the Products were "sustainably sourced."

180.    These affirmations of fact or promises by Gorton's relate to the goods and became part of the basis of the bargain.

181.    Plaintiffs and Class members purchased the Products believing them to conform to the express warranty.

182.    Gorton's breached this warranty, resulting in damages to Plaintiffs and Class members, who purchased the Products but did not receive the goods as warranted.

183.    As a proximate result of the breach of warranty by Gorton's, Plaintiffs and the Class members did not receive goods as warranted. Moreover, had Plaintiffs and the Class members known the true nature and sourcing of the Products, they would not have purchased the Products, would have purchased the Products on different terms, or would have purchased fewer of the Products.

184.    Plaintiffs and the Class members have been injured and have suffered damages in an amount to be determined at trial.

185.    Gorton's is thus liable for breach of express warranty under the common law of each of the states where the Products are sold, to the extent that Gorton's Products have been marketed, and purchased by Class members, in each respective state, and such common law applies to the claims of Class members in those states.

32

### Count VIII

**Unjust Enrichment**
**(in the Alternative, on Behalf of Plaintiffs and the Class)**

186.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

187.    As the intended, direct, and proximate result of Gorton's conduct, Gorton's has been unjustly enriched through sales of the Products at the expense of Plaintiffs and the Class.

188.    Under these circumstances, it would be against equity and good conscience to permit Gorton's to retain the ill-gotten gains that it received from Plaintiffs and the Class members, in light of the fact that the Products the Class members purchased were not what Gorton's represented them to be.

189.    Gorton's is thus liable for unjust enrichment under the common laws of each of the states where the Products are sold, to the extent that Gorton's Products have been marketed, and purchased by Class members, in each respective state, and such common law applies to the claims of Class members in those states.

### PRAYER FOR RELIEF

*Wherefore*, Plaintiffs demand judgment on behalf of themselves and the proposed Class and Subclasses providing such relief as follows:

a.      A declaration that Gorton's deceptive marketing of the Products is unlawful;

b.      Certification of the Class and Subclasses proposed herein under Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3); appointment of Plaintiffs as representative of the Class and Multistate Subclass; appointment of Plaintiff Spindel as representative of the New York Subclass; appointment of Plaintiff McCarthy as representative of the California Subclass; and appointment of undersigned counsel as counsel for the Class and Subclasses;

c.      A declaration that Gorton's is financially responsible for notifying Class members of the pendency of this suit;

d.      A declaration that Gorton's marketing of the Products is unlawful;

e.      An order enjoining Gorton's unlawful and deceptive acts;

f.      An order requiring an accounting for, and imposition of a constructive trust upon, all monies received by Gorton's as a result of the unfair, misleading, fraudulent, and unlawful conduct alleged herein;

g.      Statutory or actual damages for members of the New York Subclass pursuant to NYGBL §§ 349 and 350, and treble damages pursuant to NYGBL §§ 349 and 350;

h.      Restitution, disgorgement, refund, and/or other monetary relief, including treble damages, together with costs and disbursements, pursuant to the applicable statutes and prejudgment interest at the maximum rate allowable by law;

i.      Monetary damages and statutory damages in the maximum amount provided by law pursuant to the applicable statutes;

j.      Punitive damages in accordance with proof and in an amount consistent with applicable precedent;

k.      Awarding to Plaintiffs and Class members reasonable attorneys' fees and costs as allowed by law; and

l.      Such further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

190.    Plaintiffs hereby demand a trial by jury.

Date:  April 21, 2022

Respectfully submitted,

For the Plaintiffs,
By their Attorneys,
**PONTIKES LAW, LLC**

_____
Rebecca G. Pontikes (BBO # 637157)
Bryn A. Sfetsios (BBO # 688368)
10 Tremont Street, 3rd Floor
Boston, MA 02108
rpontikes@pontikeslawllc.com
bsfetsios@pontikeslawllc.com
Telephone: (617) 357-1888
Facsimile: (857) 488-4020


**RICHMAN LAW & POLICY**

_____
Kim E. Richman*
Jay R. Shooster*
1 Bridge Street, Suite 83
Irvington, NY 10533
T: (914) 693-2018
F: (718) 705-4579
krichman@richmanlawpolicy.com
jshooster@richmanlawpolicy.com


*Subject to admission *pro hac vice*


*Attorneys for Plaintiffs and Proposed Class and Subclasses*