1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS
2

3    JEFFREY ALAN SPINDEL, on behalf    )
     of themselves and all others       )
4    similarly situated, et al,         )
                                        )
5              Plaintiffs               )   CA No. 22-10599-PBS
                                        )   Pages 1 - 36
6         -VS-                          )
                                        )
7    GORTON'S, INC.,                    )
                                        )
8              Defendant                )

9

10                **MOTION HEARING BY VIDEO**

11         BEFORE THE HONORABLE PATTI B. SARIS
                UNITED STATES DISTRICT JUDGE
12

13

14

15

16                        United States District Court
                          1 Courthouse Way, Courtroom 19
17                        Boston, Massachusetts  02210
                          August 11, 2022, 3:04 p.m.
18

19

20

21

22

23                      LEE A. MARZILLI
                      OFFICIAL COURT REPORTER
24                 United States District Court
                   1 Courthouse Way, Room 7200
25                      Boston, MA  02210
                        leemarz@aol.com

1

A P P E A R A N C E S:

2

3       BROOKE ALLISON DEKOLF, ESQ. and DIJE NDREU, ESQ.,
Richman Law & Policy, PLLC, 1 Bridge Street, Suite 83,
Irvington, New York, 10533, for the Plaintiffs.

4

5       CAROLINE INCLEDON, ESQ., McDermott, Will & Emery LLP,
One Vanderbilt Avenue, New York, New York, 10017,
for the Defendant.

6

7       MARA THEOPHILA, ESQ., McDermott, Will & Emery LLP,
200 Clarendon Street, Boston, Massachusetts, 02116-5021,
for the Defendant.

8

9       WILLIAM P. DONOVAN, ESQ., McDermott, Will & Emery LLP,
2049 Century Park East, Suite 3200, Los Angeles, California,
90067-3206, for the Defendant.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2          THE CLERK:  The Court calls Civil Action 22-10599,

3    Jeffrey Alan Spindel, et al v. Gorton's, Inc.

4          Could counsel please identify themselves.

5          MS. NDREU:  Yes.  Dije Ndreu representing plaintiffs.

6          MS. WICKLUND:  Your Honor, Rene Wicklund representing

7    plaintiffs.

8          MS. DEKOLF:  Brooke Dekolf, also representing

9    plaintiffs.

03:04 10          MR. DONOVAN:  Good afternoon.  Bill Donovan for

11   Gorton's, and I will be conducting the argument today for the

12   defense.

13          MS. THEOPHILA:  And Mara Theophila for defendants as

14   well.

15          MS. INCLEDON:  And Caroline Incledon for defendants as

16   well.

17          THE COURT:  Okay, will everyone turn off their cameras

18   unless you're going to be arguing, so only the persons who will

19   be presenting arguments should be on.  Otherwise I get

03:05 20   confused.  And if somebody needs to jump on, they can turn

21   their camera back on again.

22          So this is a motion to dismiss.  I got a communication

23   from the amicus as to whether they needed to appear, and I said

24   they did not, via email, just to let you know.  So as far as

25   I'm concerned, this is just the parties' argument at this

1   point.

2           So, Mr. Donovan.

3           MR. DONOVAN:  Your Honor, thank you very much.  May it

4   please the Court, Bill Donovan for Gorton's.

5           Your Honor, in our view, this case is an overreach,

6   and it's an overreach for multiple reasons.  Let me start with

7   the claim for injunctive relief.  Plaintiffs cannot plausibly

8   allege that Gorton's today is using the challenged labels.

9   They can't make that argument because they know the facts are

03:06 10  contrary to that argument.  And the complaint does use the

11  present tense, but they've got Rule 11 obligations.  They've

12  got obligations of candor to --

13          THE COURT:  Wait, wait, wait, wait, wait.  You're

14  jumping the gun on this one.  An injunction is a remedy; it's

15  not really a claim.  Usually many complaints have requests for

16  the remedy of an injunction, but until there's a motion filed,

17  I don't address it, and I've not received such a motion.

18          MR. DONOVAN:  Well, your Honor, we did include in our

19  motion a challenge to the injunction, and we included cases

03:06 20  like the *Ben & Jerry's* case, which on a motion to dismiss the

21  request for injunctive relief was dismissed.

22          THE COURT:  Well, let me ask you this:  Are you still

23  using it?

24          MR. DONOVAN:  No.

25          THE COURT:  All right, so then it's not really a

1    serious issue.

2         MR. DONOVAN:  It's not a serious issue, but it's an

3    important issue because, as we pointed out in our brief, and

4    then I'll get to the claims themselves --

5         THE COURT:  I want to get to the claims because, you

6    know, I'm not about to issue an injunction.  I'm not even close

7    to that point.  As you point out, you're not using it anymore.

8    I'm not sure it's irreparable harm, and, to boot, it's a remedy

9    being sought rather than an actual claim.

03:07 10         MR. DONOVAN:  Thank you very much, your Honor.  So let

11    me go directly to the merits.  And they certainly tried to rely

12    on the two *ALDI* decisions that I know your Honor is now

13    familiar with, so I want to address those head-on because our

14    case is materially different.

15         Number one, the claims that they have made --

16    specifically, the California statutory claims -- require the

17    claims meeting the 9(b) standard.  They require the claims

18    being pled with particularity.  This complaint comes nowhere

19    close to pleading the requisite misrepresentation and statutory

03:07 20    claims with the particularity that the law requires and we

21    pointed out in our brief.

22         But I think the core issue in this case is whether or

23    not the challenged disclosures and the challenged labels that

24    Gorton's uses is somehow analogous to the *ALDI* labels, and

25    they're not, and let me tell you all the reasons for that.

1     First of all, the Gorton's label that is no longer being used
2     is very specific and it's very limited.  The only claim that
3     was made in the past said "sustainably sourced."  That's it.
4     In the *ALDI* case, ALDI was making very vague representations,
5     things like "simple," things like "sustainable," without any
6     context.  And so from our perspective, we're not saying you
7     need to disagree with the two rulings or the rationales in the
8     rulings, but our case is materially different because of the
9     claim that Gorton's previously made.

03:08    10            Another fundamental distinction, your Honor, between
11     the prior cases and this one is, *ALDI* simply had those words,
12     "simple sustainable seafood," and they had a label from BAC,
13     and there was nothing on that label to indicate to customers
14     what the certification meant or how it might relate to
15     sustainability.  So that's another material way in which the
16     cases are different.

17            The plaintiffs also in the complaint and in the
18     briefing injected the Gorton's website language into this case,
19     so it is clearly fair game under the authorities we mentioned.
03:09    20     On the labels that Gorton's used that have been challenged,
21     there is a link to their website.  And to be clear, plaintiffs
22     have the obligation to give -- go ahead.  Sorry.

23            THE COURT:  Can we just back up.  So "sustainably
24     sourced," so that's the key words, and I think it does meet
25     9(b).  It's on the package.  Sustainably sourced when?  When

1   they bought the thing.  So, I mean, I'm not worried about 9(b),

2   but I'm worried about how I think about the plausibility of a

3   claim of "sustainably sourced" when it feels like such a vague

4   claim.  So how would you -- I looked it up.  I shouldn't have

5   done this, right?  Maybe this is wrong, but I Googled the term

6   "sustainably sourced," and it actually has an environmental

7   meaning.  But at the very least, even if you could dispute what

8   it means, it means beneficial or positive in some ways, right?

9   Right, it's helpful to the -- not harmful to the environment.

03:10 10   On some environmental website, it says "environmentally

11   responsible."  So there's some environmental benefit or

12   positivity, as opposed to something filthy or that hurts the

13   environment.  I mean, would you agree that there's at least

14   some positive -- that the term connotes some positive

15   environmental aspect?

16          MR. DONOVAN:  Your Honor, I think there's nothing

17   wrong with looking at the dictionary.  We quoted certain

18   dictionaries, and I agree with you, but --

19          THE COURT:  It's a positive thing, right?  You were

03:11 20   trying to say "We're environmentally aware," not you but

21   Gorton's was trying to say that it was a positive thing, that

22   "We're sensitive to and responsible for the environment"?

23          MR. DONOVAN:  Exactly, and Gorton's has been that way

24   for 150 years.  What the Gorton's website says -- and, again,

25   in the *ALDI* cases, there was no website language; there was

1   nothing to put the label in context -- Gorton's describes

2   exactly what it did, which is, it sources tilapia from BAP

3   certified farms.  It bought it at those farms to make sure that

4   they had good standards.  And, critically, Gorton's has had a

5   partnership with the New England Aquarium for 14 years to

6   insure the practices meet the standards that you would want

7   them to meet.

8        I'm a native New Englander.  I remember Gorton's as a

9   kid.  I certainly remember the New England Aquarium, so --

03:12 10        THE COURT:  I'm looking at it as we're talking right

11  now.

12       MR. DONOVAN:  There you go.  So --

13       THE COURT:  But the problem is, how do I do that on a

14  motion to dismiss?  In other words, they're saying that the

15  fish are coming from filthy fish farms, basically in China, as

16  I understand it, one of the more salient allegations.  So how

17  do I do that on a motion to dismiss?  You're saying "no."

18  You're saying all of the fish farms in China are certified?  Is

19  that it?

03:12 20        MR. DONOVAN:  Yes, and they audit them, and the New

21  England Aquarium helps.  But here's how I think you get there,

22  your Honor.  It's our motion, and I agree with you on that, but

23  they have an obligation to plead what a reasonable consumer

24  would believe "sustainably sourced" means.  That's their

25  burden.  Nowhere in their lengthy complaint did they allege

1    what these two plaintiffs thought "sustainably sourced" meant,

2    so they didn't achieve their objective in that way.

3          The only other way they attempt to meet the burden

4    really is to cite these surveys, and the *ALDI* lawyers did not

5    do, it appears, a good enough job in articulating to the two

6    other judges in the other cases what those surveys said.  We

7    read the surveys.  We want your Honor to look at the surveys.

8    Do you know why?  None of those surveys addressed the phrase

9    "sustainably sourced" at all.  And, number two, the surveys are

03:13 10   generally looking at what European consumers allegedly think

11   about different phrases.

12          So let me give you one example.  They cited *Oleson*,

13   O-l-e-s-o-n.  It involves Norway.  I've been to Norway, it's a

14   beautiful country, but, respectfully, what Norwegian consumers

15   may think about organic and animal welfare labeled salmon has

16   nothing to do with what American consumers might interpret

17   "sustainably sourced."

18          So in terms of them pleading plausibly --

19          THE COURT:  But at core, at core -- maybe I'm being

03:14 20   too reductive here -- at core, what they're saying is

21   "sustainably sourced" means environmentally responsible.  You

22   used that term yourself just now.  And they're saying this

23   wasn't.  Basically they're saying there are filthy fish farms

24   for tilapia in China.  You're saying, "No, they weren't filthy.

25   They'd been certified, and we've had them checked, and one is

1    the New England Aquarium has these standards and --" but how do

2    I do that on a motion to dismiss?  That's what I'm just not

3    getting.

4              MR. DONOVAN:  You can do it on a motion to dismiss

5    because what they ultimately have to show you and what they

6    haven't shown you, respectfully, your Honor, is what a

7    reasonable American consumer reading "sustainably sourced"

8    would believe that phrase to mean.

9              THE COURT:  Well, can you agree that at least it's

03:15 10   considered a good thing, or you wouldn't have put it on the

11   packaging?

12             MR. DONOVAN:  When I first saw this complaint, your

13   Honor, I'll admit my initial reaction:  Is Gorton's using wild

14   fish, right?  Because if they were selling wild fish as

15   unsustainable, maybe that's a problem.

16             And then let me point this out because it's very

17   material to the very helpful questions you've been asking me.

18   If you look at that first page of the decision in the Illinois

19   case, the Federal Court up in Chicago --

03:15 20             THE COURT:  Which one?  That's the --

21             MR. DONOVAN:  That's the *Rawson* case, the *Rawson*/

22   *ALDI* case.  In that case, they specifically alleged, which they

23   can't allege here, that ALDI was using in fish food wild

24   salmon.  So in that case, they made the specific allegation --

25   and the court agreed with the allegation -- that they were

1    using wild fish food, depleting natural stocks of fish, and

2    that was harmful to the environment.  So it's another

3    distinguishing factor, right?

4         The claim that Gorton's is making is very narrow.

5    Gorton's is backing up what that claim means on its website.

6    Gorton's is not saying that they have quote/unquote

7    "sustainable practices" in using the example we all know of

8    selling sea bass that's apparently disappearing.  The studies

9    mention nothing that's relevant for you to address what

03:16 10   "sustainably sourced" means to an American consumer.  Gorton's

11   practices are clearly --

12        THE COURT:  I understand your point on the studies, I

13   do, and I understand even your notion of going into the

14   dictionary as to what's sustainable, but what they're alleging

15   is that it's actually filthy and that in fact it's not

16   environmentally responsibly farmed, I think.

17        MR. DONOVAN:  Well, filthy, I think if you go to any

18   dictionary, filthy is not sustainable, right?

19        THE COURT:  Right, good, is that the line that you're

03:16 20   drawing, which is that filthy fish farms are not indicative of

21   sustainability?

22        MR. DONOVAN:  What I'm saying, your Honor, is, both of

23   us know that New England Aquarium would not sign off on fish

24   farms that are filthy.

25        THE COURT:  I just can't do that on a motion to

1   dismiss.

2       MR. DONOVAN:  Correct, but what you can agree on a

3   motion to dismiss is, the claim that Gorton's voluntarily no

4   longer makes, having nothing to do with this lawsuit, is so

5   narrow that the only claim that is before you is whether

6   Gorton's advertised correctly that its products were

7   sustainably sourced.  They were sustainably sourced because

8   they were not wild-caught fish, and because Gorton's defined on

9   its website what it meant by "sustainably sourced."

03:17 10       THE COURT:  Well, do you think I can go to the website

11  even?  Most people aren't going to go to a website if they're

12  grabbing it off the shelf, a supermarket shelf.  They think

13  this is like the equivalent of organic or something.  They

14  think it's just, "Oh, good, it's good for the environment," or,

15  "It's good for me."

16       MR. DONOVAN:  Well, they haven't given you anything to

17  make that conclusion in their allegation as to what any

18  consumer would think.  But one of the problems, having gone up

19  against these folks in other cases before, is, they're setting

03:18 20  up a standard where it's "heads I win, tails you lose," right?

21  They criticize ALDI because ALDI uses words that Gorton's would

22  not use and did not use.  "Simple," is it simple?  I don't

23  know.  And "sustainable" without any inquiry, right?  But the

24  allegation and so its survival motion to dismiss in the Chicago

25  case was:  "You're using wild fish.  Wild fish is depleting

1    natural resources.  Therefore, it can't be sustainable."

2         None of that's true with respect to the allegations

3    here.  There's no federal definition of "sustainably sourced."

4    What they should do is, they should go to the government, go to

5    Congress, go to the agency, come up with a definition; and so

6    if someone isn't meeting it, they can't meet it.  What they're

7    doing, right, is they're sort of -- there's an element of their

8    putting the Sword of Damocles to the throat, in this case of

9    Gorton's, where they're not giving a study that has anything to

03:19 10    do with the claim.  They're not saying the plaintiffs have a

11    definition that makes any sense.  The dictionary definition of

12    "sustainable" is consistent with Gorton's is not harming the

13    environment because they're not depleting the resources --

14         THE COURT:  Stop there.  So Gorton's would agree with

15    the definition "not harming the environment"?

16         MR. DONOVAN:  Gorton's would agree with the definition

17    on its website.  I'm trying to give you some helpful context --

18         THE COURT:  And Gorton's definition on the website is?

19         MR. DONOVAN:  That Gorton's is committed to sourcing

03:19 20    its tilapia from BAP-certified farms, and that Gorton's

21    continues to work on its sustainability efforts with partners

22    like the New England Aquarium and --

23         THE COURT:  But that's not a definition.  I mean --

24         MR. DONOVAN:  Well, it describes the practices.

25         THE COURT:  Yes, it does.

1          MR. DONOVAN:  And, look, they have got to show you

2     what a reasonable consumer would believe the phrase means and

3     that a reasonable consumer would be misled.  They didn't say

4     they were organic practices.  They didn't say they were best

5     practices, right?  Gorton's disclosed aquaculture on its

6     website, which ALDI doesn't do.  They give information to

7     consumers.  They injected the website into the case.  And we

8     cited to your Honor examples in your district, right, the great

9     City of Boston where courts on a motion to dismiss in similar

03:20 10   circumstances have granted the motions.  Two examples --

11          THE COURT:  That may be, but a bunch of cases have

12     recently been reversed by the First Circuit for granting that

13     too prematurely.  So I'm struggling with the fact that you may

14     have great defenses, but how to do that on a motion to dismiss.

15     I'm not sure I buy completely the plaintiffs' definition of

16     "sustainably sourced," but at least we can all agree it means

17     positive for the environment, right?

18          MR. DONOVAN:  And I would argue that they really can't

19     contend fairly that Gorton's practices aren't positive for the

03:20 20   environment.  They want to impose a regime on a company that's

21     been around for so long and delivering great quality fish to

22     consumers for 150 years by, in our view, making up a definition

23     that a reasonable consumer would believe, which doesn't exist

24     in the facts or the law, and then trying to impose their

25     unilateral view as to what they think a company should do when

1  it's not industrywide, where it's targeting a company that's

2  doing the right things.  I would encourage plaintiffs' counsel

3  to come up with any other company in the fish industry who's

4  partnering with --

5       THE COURT:  No, come on, this isn't fair game.  I

6  mean, it sounds like a -- it's too rhetorical.  I'm just

7  looking at the four corners of the complaint.  That's all I'm

8  looking at.  I understand your outrage because you feel like,

9  "Well, we've done everything right here, we've gotten it

03:21 10  certified," but it's just all outside the four corners.

11       Well, let me ask you this:  Do you get tilapia from

12  China?

13       MR. DONOVAN:  They do get tilapia from China, yes.

14       THE COURT:  And is it a big hunk of it or an

15  insignificant amount?

16       MR. DONOVAN:  It's a meaningful amount, and Gorton's

17  discloses what its practices are.  It discloses how Gorton's

18  takes reasonable and uses corporate responsibility to insure

19  that tilapia is well raised and it's, you know, good for the

03:22 20  consumers.  But, again, I want to go back to where I was a

21  couple of minutes ago.

22       THE COURT:  So basically Gorton's sends its own people

23  out there?

24       MR. DONOVAN:  They send their own people out there.

25  They use this independent certifier of BAP.  They use the

```
 1    Aquarium resources to make sure they're doing it right.
 2            THE COURT:  So your basic defense is, it's not false?
 3            MR. DONOVAN:  Exactly, it's not false, and unlike the
 4    ALDI claim, it's a very narrow claim; it was a very narrow
 5    claim.  Your Honor could reasonably interpret "sustainably
 6    sourced" to mean exactly what's on the website for Gorton's.
 7    And the fact that they don't allege that they're using wild
 8    fish or wild fish food is enough to get over that limited
 9    hurdle.  All these practices were not clear.  They weren't
10    nearly as rigorous.  For whatever reason, the lawyers in that
11    case did not effectively articulate that the surveys they're
12    relying so heavily upon don't provide a scintilla of support
13    for their arguments, and we all know that you just can't allege
14    something and get beyond a motion.
15            In the cases I mentioned, you know, the Honey Bunches
16    of Oats case and the Polar Ginger Ale case, I think they're
17    good law.  I don't think they've been overturned by the First
18    Circuit.  Litigating in California where I now live is one of
19    the hardest jurisdictions as a defense lawyer; but the reality
20    is, they haven't met their burden, in our view, to give your
21    Honor enough to be able to say, "You know what?  I didn't have
22    a meaningful definition of a reasonable consumer, and the
23    reasonable consumer would be confused."  And I think, for the
24    reasons we've been discussing, there is a wide difference, a
25    gulf of difference between not only the claims that were
```

1  alleged against ALDI but ALDI's practices, and because those

2  practices are --

3          THE COURT:  We're not ALDI now, so --

4          MR. DONOVAN:  We're not ALDI, and based on your

5  Honor's reputation, I knew you would take an independent look

6  at this issue despite those rulings.  I think we're much closer

7  to the *Honey Bunches of Oats* case and the *Polar Ginger Ale* case

8  where there's no correlation between "filthy" and "sustainably

9  sourced."  There just isn't.  And so what --

03:24 10         THE COURT:  I mean, that's what's interesting because

11 "sustainable" means not depleting or --

12         MR. DONOVAN:  Right.

13         THE COURT:  So it wouldn't necessarily obviate or

14 preclude the use of fish farms, but it might preclude the use

15 of filthy fish farms.

16         MR. DONOVAN:  I don't think it would.  I don't think

17 that's what Gorton's claim was, and I don't think that they

18 provided your Honor anything in this complaint to suggest that

19 that's what the surveys say or that somehow sustainably

03:24 20 sourced --

21         THE COURT:  I don't really care so much about the

22 surveys.  I'm just at plausibility.  I'm at the threshold:  Is

23 it plausible?

24         MR. DONOVAN:  And my response, among others, would

25 be --

1          THE COURT:  When you look it up, there's a defined

2    term in the environmental world, in Wikipedia anyway, I mean,

3    that basically it means environmentally/socially responsible is

4    what "sustainably sourced" means.  Now, that doesn't mean we

5    have to pick up that definition because I don't know that a

6    reasonable consumer would know that definition, but certainly

7    it connotes a positive environmental approach.

8          MR. DONOVAN:  So -- sorry, your Honor.  Go ahead.

9          THE COURT:  No, no, no.  Anyway, let me jump to -- and

03:25 10   I'll give you a chance for rebuttal because I do understand the

11   basic argument.

12          So I'm curious because it's not so clear that this

13   survey's definition is the definition.  I mean, it's got to be

14   a reasonable definition or a reasonable understanding.  So let

15   me let you argue for a minute.

16          MS. NDREU:  Yes, may it please the Court, Dije Ndreu

17   representing plaintiffs.  Yes, your Honor, as we've noted in

18   our briefs, you know, the surveys were just basically some

19   additional support for our plaintiffs' plausibly pleaded

03:26 20   claims.  They were not the core of our case.  And as you've

21   stated numerous times in speaking to Mr. Donovan, the burden at

22   the motion to dismiss stage, this is not the time for fact

23   arguments and fact discusses.  We can get into surveys, we can

24   perhaps hear from Gorton's what surveys they've done as to what

25   sustainable means, but we're not at this point yet, and --

1          THE COURT:  So assume it's not the surveys.  I mean,

2     is it your position that any fish in a fish farm is not

3     sustainably sourced?

4          MS. NDREU:  Well, we believe that in total, our

5     complaint has plausibly alleged that the claim is misleading

6     because the fish are farmed; and, as your Honor noted, in a

7     motion to dismiss, it doesn't have to be provable or even

8     probable.

9          THE COURT:  It seems plausible to me that any fish

03:27 10     from a fish farm -- any fish from a fish farm, let's say the

11     cleanest, most pristine -- in fact, some of the definitions, if

12     you look online, says sustainability is promoted by a fish farm

13     because in fact it's not depleting the wild sources in the

14     ocean.  So I at least think there's another definition there.

15     "Sustainable" means it can be sustained.  So I don't know that

16     I would take as plausible -- let me just put it this way --

17     that any fish in a fish farm, that that would be misleading.

18          MS. NDREU:  Right, and that's not what the complaint

19     alleges.

03:27 20          THE COURT:  Okay.

21          MS. NDREU:  The complaint alleges that the fish farms

22     that Gorton's use, they admit on their website and counsel has

23     admitted they farm some fish from China, and there is evidence

24     that those are not sustainable for the reasons you mentioned,

25     environmental harm, also animal welfare.  So it's not any fish

1    in any farm.  It's these fish farms' fishes.

2         THE COURT:  Right.  So you don't think I have to -- I

3    mean, there were some parts of your briefing -- I couldn't

4    pinpoint it right now -- that seemed to imply that any fish out

5    of a fish farm would be not sustainably sourced.  I don't think

6    either common sense or the things that I've read would say

7    that.

8         MS. NDREU:  Right, that's not what the complaint

9    alleges, so --

03:28 10         THE COURT:  Okay.  All right, so basically you're

11    conceding that some fish from some fish farms may be sustainably

12    sourced, right?

13         MS. NDREU:  Theoretically, yes.

14         THE COURT:  Okay.  So now it's a question of, are they

15    filthy or they don't meet -- so would you say that they're not

16    meeting the -- the Aquarium sent me an amicus brief, and of

17    course Gorton's vehemently protest that they meet best

18    practices.

19         MS. NDREU:  Right.  Again, these are fact issues that

03:28 20    aren't appropriate at this stage.  What's important is that the

21    plaintiffs saw the label in the store and relied on that label,

22    and, you know, they're not expected to go to a website and

23    check out what certifications Gorton's may or may not have.

24         THE COURT:  Do you have any information that Gorton's

25    tilapia came from these filthy fish ponds as opposed to

1    certified ones?

2         MS. NDREU:  Well, again, some of them come from China.

3         THE COURT:  A big country, a big country.

4         MS. NDREU:  Right, right.  And, again, if that's the

5    argument, you know, some of them may come from a good part of

6    China.  How is a consumer supposed to know looking at the

7    package?  Either they're all good or they're all bad.  I don't

8    think our complaint falls because some small portion of the

9    fish might come from a clean farm.

03:29 10        THE COURT:  But suppose Gorton's -- I'm just trying to

11   understand this case.  If in fact Gorton's -- and this may be

12   summary judgment, motion to dismiss -- proves up that every

13   single farm they get their fish from has been certified

14   according to these various standards as best practices, isn't

15   that the end of the suit?

16        MS. NDREU:  Well, I don't think we're there yet, and,

17   again, you know, discovery as to, you know -- counsel and

18   amicus are expecting us to take at face value that the BAP

19   standard is the gold standard, that any fish farm according to

03:30 20   those standards is automatically sustainable, and we're just

21   not at that point yet.  We haven't done discovery.  This is a

22   motion to dismiss.  I think it's premature to ask whether, you

23   know, if they meet the BAP standard, that our case fails.

24        THE COURT:  So what I was struggling with is -- I

25   agree with you that I can't go to the website and I can't go to

1  all these other places, and I'm not going to make fact

2  findings.  What I'm struggling with is, assume for a minute

3  that I don't think it's plausible to say that all tilapia at

4  fish farms are not sustainably sourced.  So if it's a clean

5  fish farm or an appropriate fish farm, it doesn't hurt animal

6  welfare or the like or hurt the environment, I would have to

7  say that "sustainably sourced" wouldn't be misleading or even

8  wrong.  But you allege that a lot of these farms in China are

9  filthy, and I'm assuming you have a good-faith basis for saying

03:31 10  that.

11            MS. NDREU:  Yes.

12            THE COURT:  You have pictures of them and that sort of

13  thing.  So how do we tie the fact that there are hideous fish

14  farms in China with what Gorton's is selling?  Like, how do we

15  make that nexus?

16            MS. NDREU:  Well, I mean, Gorton's admits that they

17  source at least part of their tilapia from these Chinese farms.

18            THE COURT:  Are they the farms that are filthy?  Are

19  you saying that basically all the Chinese farms are filthy

03:31 20  because it's not regulated?

21            MS. NDREU:  That's something that, you know, we will

22  address through discovery, but we think, on a good-faith basis,

23  we put enough facts into our complaint to put the defendant on

24  notice at this stage of what they need to defend.  So I hear

25  what you're saying, your Honor, but I believe that's for

1   discovery, those issues.

2        THE COURT:  Are there fish farms in the United States

3   that you've seen that are appropriate?  In other words, is

4   there some plausible basis for believing that the tilapia comes

5   from the bad Chinese farms as opposed to good Chinese farms, or

6   are you essentially saying that all the farms are bad?

7        MS. NDREU:  I think we're saying at least some of the

8   farms are bad.  And we don't know.  You know, if Gorton's sold,

9   you know, separate products, some from the good part of China,

03:32 10  and those were labeled as sustainable and there's some

11  plausibility to that, some that we don't know, that would be

12  one thing; but there's just one simple, you know, "sustainably

13  sourced" label, and a consumer has no way of knowing.

14       THE COURT:  Well, first of all, it's in the past tense

15  because apparently they're not doing it anymore.

16       MS. NDREU:  Well, yeah, that's recent communication

17  from counsel.  If that's the case, you know, as you noted, our

18  complaint is pleaded in the present; and at the time the

19  complaint was filed, you know, based on information and belief,

03:33 20  we believed they were still using the label.

21       THE COURT:  No, I'm not blaming you, but it sort of

22  takes the urgency away.  I guess what I'm trying to get is, I

23  take it -- I understand the concern because some of the fish

24  comes from China and some of the Chinese fish farms are filthy.

25  Is there anyplace in the complaint where they allege how

1    pervasive that is, that the fish farms in China are filthy?

2        MS. NDREU:  We have citations to the Monterey Bay

3    Aquarium and so forth.  And just another point.  Again, this is

4    not the main part of our case, but additional evidence of the

5    unsustainability, as it were, is the presence of ethoxyquin in

6    one of the products that were tested.  And, again, that's just

7    additional evidence; that's not the main part of our case.

8        THE COURT:  Tell me about that.  Gorton's claims that

9    it's within FDA standards.

03:34  10        MS. NDREU:  Right, and we're not alleging a violation

11    of an FDA standard, and, again, this isn't the sole, you know,

12    basis for the complaint, but it is additional evidence that we

13    believe, based on information and belief, that the lab testing

14    that was done indicates that the products come from

15    unsustainable farms, whether it's like you said, the filthy

16    farms.

17        THE COURT:  So help me.  So when you say unsustainable

18    farms, is it because of this chemical?

19        MS. NDREU:  Yes.  Generally it is put in certain fish

03:34  20    food that is fed to these industrial farm operations that are

21    generally, like you said, the filthy, poorly run fish farms in

22    China.

23        THE COURT:  So that's your evidence?

24        MS. NDREU:  It's additional evidence.  Again, this is

25    just an additional --

1          THE COURT:  It's not a separate claim.  It's just a --

2          MS. NDREU:  No.  It's more support for the claim.

3     But, again, our case doesn't rise and fall on this one issue.

4          THE COURT:  Do you have -- I was going to use the word

5     "spies," but that's inappropriate.  Do you have investigators

6     who have sort of checked out where the fish have come from in

7     China?

8          MS. NDREU:  No.  I mean, again, this is a fact issue

9     for later, but I do not believe that, you know, we have someone

03:35 10   in China right now.

11          THE COURT:  I doubt anyone would have that kind of

12    access, but it would be more from people who -- internal

13    whistleblowers or the like within Gorton's.  You don't have a

14    factual basis for knowing it comes from filthy fish farms?

15          MS. NDREU:  We believe we have, again, a sufficient

16    basis.  No, we do not have an insider from Gorton's, if that's

17    what you're asking.

18          THE COURT:  So, all right.  Well, I will chow through

19    this to try and figure it out.

03:35 20        MS. NDREU:  Your Honor?

21          THE COURT:  By the way, just a funny aside.  There was

22    one -- as I was looking up "sustainability," there was a whole

23    section on tilapia.  Have you seen it, on sustainably sourced

24    tilapia?  And one of the headlines was "Tilapia is worse than

25    pork."  I thought that was interesting, just in general.

1              Do you think it's appropriate for me to use

2      environmental standards that are adopted by the community on

3      environmental sustainability, as opposed to just looking at

4      what some random consumer might think it means?

5              MS. NDREU:  Well, again, that's a fact issue for

6      later, but we don't think that our complaint alleges what a

7      random consumer might think.  We have met the standard of

8      plausibly pleading what a reasonable consumer would believe --

9      could believe, excuse me.  Mr. Donovan said we needed to prove

03:36 10   what they would believe.  Actually, the standard is what they

11     could believe.  But even so, we actually believe we plausibly

12     pleaded what they would believe.  And, you know, the issue

13     isn't what Gorton's thinks "sustainably sourced" means or what

14     the (Unintelligible) thinks it means.  It's what the reasonable

15     consumer thinks it means, and we believe we've met that

16     standard, even though it's actually premature to consider that

17     right now.

18              THE COURT:  You know, the problem you have a little

19     bit is *Iqbal/Twombly*, which is, I've got to figure out what's

03:37 20   plausible.  As I've already said, I don't think it's plausible

21     to say that all fish farms' tilapia is not sustainably sourced.

22     I have to think some people might argue that only fish farm

23     tilapia is sustainably sourced, I mean, as I saw the various

24     definitions.  But the filthy piece is the piece that caught my

25     eye, and I'm trying to figure out whether there's enough

1   alleged to tie what you in good faith have alleged that you've

2   seen in China to the specific tilapia that Gorton's sells,

3   so -- and you're saying, well, no, we need to have -- what kind

4   of discovery would you need, in other words, to see if it comes

5   from some of those places?  In other words, I don't want to

6   open this up to full-blown damages discovery, blah-blah-blah,

7   if it turns out that every single one of the ponds has been

8   certified and --

9       MS. NDREU:  Yes, so, again, I think that's even a

03:38 10   threshold issue.  You know, I don't think it's appropriate to

11   just accept the facts being put forth by amicus and by defense

12   that these standards are what they say they are, and that, you

13   know, we need to prove a violation of the standards.  But

14   actually our discovery, to get to your actual question, would

15   be, you know, supply chain.  That's where we would be

16   looking -- what exactly, where are these farms, what's

17   happening at them? -- that type of thing.

18       THE COURT:  How would one even do discovery in China?

19       MS. NDREU:  Well, I mean, we would send discovery to

03:38 20   Gorton's and have them identify their supply.

21       THE COURT:  All right, let's just say there's a pond

22   in, I don't know, in Wuhan, all right, comes to mind, there's a

23   fish pond in Wuhan we get it from, how would you -- so I guess

24   you would be looking for the Gorton's inspection report for

25   Wuhan?

1          MS. NDREU:  Exactly, things like that, any

2     communications, any documentation, you know.  Because Gorton's,

3     you know, they're pushing this certification issue, we would be

4     asking for all of that information, you know, what kind of

5     monitoring they do, that type of thing.

6          THE COURT:  Let me ask you -- I'm not there yet, but

7     let's just say -- let me turn to Gorton's.  Let's say I thought

8     there was enough to -- and I'm not sure yet.  It's more because

9     of the nexus issue than -- I cannot go into your website; I

03:39 10    cannot go into the amicus brief.  That's all extraneous

11     information.  If I thought there was enough alleged but I'm

12     worried about it, because you may be absolutely right that

13     everything -- is there a narrow way to tailor discovery in

14     order to prove up your point that every single one of the ponds

15     has been looked at, the fish farms?  You know what I mean,

16     the --

17          MR. DONOVAN:  Your Honor, we would meet and confer

18     with plaintiffs' counsel in good faith, but really what I want

19     to do is avoid discovery, because I think you asked some very

03:40 20    pointed questions to plaintiffs' counsel, and I think the

21     answers hopefully don't satisfy your Honor.  Number one,

22     they've admitted through their silence that they have not

23     alleged what these actual plaintiffs thought "sustainably

24     sourced" meant.

25          Number two, plaintiffs' counsel ran away from the

1    surveys that they highlighted in their complaint because I

2    think plaintiffs' counsel know those surveys don't provide your

3    Honor with any support for any definition of "sustainably

4    sourced" that's a problem for Gorton's.

5        Number three, all there is in this complaint -- and I

6    know why your Honor is concerned about it -- is just the word

7    "filthy."  But I want to be perfectly clear about something.

8        THE COURT:  That may have been my word.  I don't

9    remember.

03:41 10        MR. DONOVAN:  Fair enough, but what they do is, they

11    sort of attack China in the complaint without actually

12    tethering it to Gorton's actual practices.  So they've got

13    pictures and sort of inflammatory words, right?  But the nexus

14    that you've been looking for, that nexus is not there.  It's

15    simply not there.

16        And plaintiffs' counsel also struggled with what

17    should have been a very easy answer to your question because

18    they don't want to admit, right, whether nothing can be

19    sustainable ever, because really what they argue in these cases

03:41 20    is that nothing is ever good enough, right?

21        THE COURT:  Well, no, she did not own that position.

22    She did not say that all fish farms.  I was worried about that,

23    but --

24        MR. DONOVAN:  Well, it took a while to get there, and

25    I want to address --

1           THE COURT:  Can I ask you, from a consumer point of

2      view, assume the following:  that a large amount of Gorton's

3      fish comes from China -- you said that -- and that a large

4      percentage of the Chinese fish farms are dirty, is that enough

5      to get you over the hurdle, since she obviously can't know

6      which ponds you're using?

7           MR. DONOVAN:  So I don't think it gets them over the

8      hurdle for a couple reasons.  Number one, some of the fish

9      comes from China.  I don't want to be deemed to have

03:42 10      characterized it in any other way other than "some."  The

11      complaint does not identify any specific allegedly filthy farm

12      from which Gorton's gets its fish or that these two plaintiffs

13      bought their fish.  And the whole reason why Gorton's goes

14      through the certification process and partners with the Aquarium

15      is to insure that the fish doesn't come from problematic

16      venues, right?

17           THE COURT:  Is there a testing protocol that

18      Gorton's --

19           MR. DONOVAN:  Yes.

03:43 20           THE COURT:  Because, I don't know, what can I say?

21      China is a long way away, and it's not easy to go in and out of

22      the country, especially recently with COVID and everything.  So

23      how does one -- when it comes from China into this country, is

24      it designated by farm, and then somebody tests it to make sure

25      it's --

```
 1              MR. DONOVAN:  Yes.  There are --

 2              THE COURT:  -- antibiotics or whatever?

 3              MR. DONOVAN:  Your Honor is exactly right.

 4              THE COURT:  What?

 5              MR. DONOVAN:  Your Honor is exactly right.  There are

 6    auditing practices.  And I want to talk about the chemical that

 7    you and I both have trouble pronouncing, right?  I think it's

 8    ethoxyquin.

 9              THE COURT:  Ethoxyquin, okay.

03:43 10              MR. DONOVAN:  But to be clear, I want to turn their

11    argument against them because I think it's convincing, okay?

12    The complaint trumpeted this as a talking point, right?  Any

13    presence in a fish food is a bad thing.  We've got experts at

14    our firm who know this FDA stuff backwards and forwards, right?

15    So what's clear in the briefing in front of your Honor is,

16    there are standards for the amount of this chemical that can be

17    in the fish food.  They conceded in their brief and they

18    conceded today that the amount they tested in only one product

19    is lower than those standards.

03:44 20              So I would argue, if there's a standard and they test

21    and it's below the standard, it proves our point that it is

22    sustainable, right?  So we caught them in what I would say was

23    another exaggeration --

24              THE COURT:  No, no, because she's saying that's not

25    the mainstay of her argument.
```

1          MR. DONOVAN:  Well, I'm not sure what the mainstay is.

2          THE COURT:  Sustainable isn't just about whether or

3    not there are chemicals in it or not.  It's about whether or

4    not it's environmentally responsible as to how the fish farms

5    are run.  And then you can have a debate about what

6    "sustainability" means, whether it means harm to animals or

7    whether it means environmentally responsible with respect to

8    the environment generally.

9          So, anyway, I'm going to take this under advisement.

03:45 10   I'm staying discovery till I figure it out.

11         Let me just ask plaintiff one last question.  I don't

12   remember.  Do you somewhere allege what these individual

13   plaintiffs, whether they were misled or not?

14         MS. NDREU:  Yes.  Both plaintiffs allege the time

15   period they bought the products in, where they bought the

16   products, representations they saw, and that they relied on the

17   representations, and therefore suffered injury.

18         THE COURT:  So do they say what they believed it

19   meant?

03:45 20   MS. NDREU:  Oh, that question, no, but we allege that

21   generally consumers think that this term "sustainably sourced"

22   means higher environmental standards and higher animal welfare

23   standards.

24         THE COURT:  He makes a point which I haven't thought

25   of before and I should have -- I mean, and I would allow you to

1  amend if this is really what the issue was -- what did they

2  think it meant?

3         MS. NDREU:  They believed that it meant those things

4  that I just said, higher environmental standards, higher --

5         THE COURT:  They personally did?

6         MS. NDREU:  Yes, yes.  And, your Honor, if I could

7  address one other point?

8         THE COURT:  I don't think this case would rise and

9  fall on that because I'd allow you to amend to allege what they

03:46 10  personally felt and that they personally felt misled.  But what

11  about the nexus?  That's the one that's really worrying me.

12         MS. NDREU:  Explain, your Honor.

13         THE COURT:  About whether or not, yes, there are

14  filthy farms in China, yes, there are non-sustainable fish

15  farms in China, but an allegation that the particular fish that

16  Gorton's is importing comes from those farms?

17         MS. NDREU:  Yes, and, again, we think our complaint

18  has sufficiently plausibly alleged that, and that would be

19  something for fact discovery.  And it does seem interesting

03:46 20  that defense counsel seems to not want to do discovery on that.

21  We don't think Gorton's can represent that none of this fish

22  come from these filthy farms.  We're alleging that they do, and

23  that's something for discovery.

24         THE COURT:  Yes.  Okay, it's very interesting.  Thank

25  you.

1          MS. NDREU:  Your Honor, if I could make another point?

2          THE COURT:  Oh, sure, go ahead.

3          MS. NDREU:  You know, defense and amicus rely heavily

4     on this BAP standard.  We don't believe that BAP means

5     something is sustainable.  And it's interesting that counsel

6     goes to great lengths to distinguish the *ALDI* case in which the

7     ALDI label said "simple sustainable seafood."  That's one

8     phrase.  The plaintiffs were not going after the word "simple,"

9     "simple sustainable seafood."  But counsel seems to think it's

03:47 10    distinguishing that in that case, there was BAP on the label,

11    and consumers didn't know what it meant.  But in this case,

12    it's even more far removed.  Gorton's seems to believe that a

13    consumer -- this is different from *ALDI* because the consumer

14    now has to go to Gorton's website to see that --

15         THE COURT:  I know.  I'm not buying that.  You don't

16    have to go to a website.  But I do have to say that if in fact

17    there was industry standards, if that's the right word, and

18    these ponds meet those standards, and those standards are

19    designed to be environmentally friendly, I think you might be

03:48 20    out of luck if all the ponds were certified.  Not out of luck

21    but -- or, actually, maybe lucky because you were shown that

22    this stuff doesn't come from the bad place, so --

23         MS. NDREU:  Yes, and that's something that was, you

24    know, not to be discussed in a motion to dismiss.  We can just

25    argue the merits of the BAP certification.  But I will point

1    out that Paragraph 77 of our complaint does specifically state

2    that our plaintiffs did rely on the "sustainably sourced"

3    representation and believed that it meant that the fish were

4    sourced in accordance with higher environmental and

5    animal welfare.

6            THE COURT:  I'm getting there.  Yes, you did allege

7    it.

8            MS. NDREU:  Yes.

9            THE COURT:  You did.

03:49 10            MS. NDREU:  But again, you know, the merits of a

11    particular, and, again, industry --

12            THE COURT:  That's fine.  I just didn't remember that.

13    That's why I asked.

14            All right, okay, thank you.  Have a nice summer.  No

15    discovery until I rule on this, so discovery is stayed, and I

16    will struggle with it.  But let me just say, if I let this go

17    to the next stage, it's unlikely to be full-blown discovery.  I

18    probably won't go to damages or that sort of thing, and I

19    certainly wouldn't go to multiple states.  It would be more

03:49 20    along the lines of establishing whether there's a nexus to any

21    of the dirty farms, as opposed to the ones that have been

22    certified, and whether or not they meet the certifications, and

23    whether or not those certifications demonstrate environmental

24    responsibility, because I'm quite sure the New England Aquarium

25    wouldn't certify the kind of fish ponds that were alleged in

 1   the complaint.

 2           So, okay, good.  Well, thank you.  It's a very

 3   interesting case.

 4           MR. DONOVAN:  Thank you very much, your Honor.

 5           MS. NDREU:  Thank you, your Honor.

 6           THE COURT:  It beats the other patent case I was

 7   working on.  Thank you very much.

 8           MR. DONOVAN:  Thank you.  Enjoy the rest of the

 9   summer.

03:50 10         THE COURT:  Thank you.  Bye-bye.

11           MR. DONOVAN:  Bye-bye.

12           (Adjourned, 3:50 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2


3

UNITED STATES DISTRICT COURT )
4    DISTRICT OF MASSACHUSETTS    ) ss.
CITY OF BOSTON                )
5

6


7         I, Lee A. Marzilli, Official Federal Court Reporter,

8    do hereby certify that the foregoing transcript, Pages 1

9    through 36 inclusive, was recorded by me stenographically at

10   the time and place aforesaid in Civil Action No. 22-10599-PBS,

11   Jeffrey Alan Spindel, et al v. Gorton's, Inc., and thereafter

12   by me reduced to typewriting and is a true and accurate record

13   of the proceedings.

14         Dated this 26th day of October, 2022.

15

16

17

18

19         /s/ Lee A. Marzilli
         _____
20         LEE A. MARZILLI, CRR
         OFFICIAL COURT REPORTER
21

22

23

24

25